IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Bridgett McGill, :

       Plaintiff : Civil Action 2:13-cv-00484

v. :

Unum Life Insurance Company of : Magistrate Judge Abel
America,
 :
       Defendant
 :

# Order

Plaintiff Bridgett McGill brought this action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, challenging defendant Unum Life Insurance Company of America's termination of her long-term disability benefits. This matter is before the Court on the parties' March 18, 2014 simultaneous motions for judgment on the administrative record (docs. 22 & 23).

**I. Overview**

McGill worked for Time Warner Cable LLC as a customer service representative handling a high volume of incoming telephone calls. The job required her to use a computer keyboard and mouse to make entries and move between computer screens during telephone calls. The central issue in this case is whether the occupation of customer service representative, as performed in the national economy, requires the continuous use of hands for keyboarding and operating a computer mouse or only

frequent (up to two-thirds of the time) use of a keyboard and mouse. It is undisputed that McGill's treating orthopedist told Unum that McGill was capable of frequent use of a keyboard and mouse. Unum decided that McGill could perform the occupation of customer service representative as it is performed in the national economy because it only required frequent use of her hands.

## II. Background

From May 2008 through July 2011, plaintiff Bridgett McGill was employed by Time Warner Cable as a customer service representative. On July 10, 2011, McGill was injured in a motorcycle accident. As a result of injuries to her right hand, McGill submitted a claim for long term disability benefits through a plan administered by defendant Unum Life Insurance Company of America ("Unum"). Unum is both the administrator of the plan and the payor.

> The policy provides:
>
> You are disabled when Unum determine that:
> - you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury;
> - you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.
>
> After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.
> . . .
> You must be continuously disabled through your elimination period. Unum will treat your disability as continuous if your disability stops for

> 90 days or less during the elimination period. The days that you are not disabled will not count toward your elimination period.
>
> Your elimination period is the later of:
> - 26 weeks; or
> - the date your Short Term Disability payments end, if applicable.

Doc. 16-2, PageID 1236. The terms of the policy dictate that a "regular occupation" is the occupation that the claimant is routinely performing when disability begins and that Unum will consider a claimant's occupation "as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location." Doc. 16-3, PageID 1253.

### III. Evidence of Record

Edward L. Westerheide, M.D. On August 23, 2011, Dr. Westerheide, who practices as an orthopedic and sports medicine specialist, examined McGill at the request of James Patrick Johnston, D.O. McGill reported constant, burning pain in the right hand since a July 10, 2011 motorcycle accident. She sustained small lacerations or abrasions to the third, fourth, and fifth PIP dorsal knuckle region. Previous treatment included sutures, casting, occupational therapy, and pain medication. McGill said she experienced significant finger stiffness after seven occupational therapy sessions. Doc. 16-1, PageID 1135.

On examination, McGill had healed scars on the dorsum of the PIP joints for the third, fourth and fifth digits. There was no abnormal swelling or color changes. There was mild tenderness to palpation of the joints. She was unable to make a full fist. Her

3

MCPs had nearly normal motion. The maximum flexion of the joints was to 80°. There was no instability. Grip strength was reduced. *Id.*, PageID 1136. X-rays showed no fractures, arthritic changes, or bone lesions. Dr. Westerheide's assessment was contracture of the right hand and reflex sympathetic dystrophy. He recommended pain management and aggressive occupational therapy. He believed McGill should return to work because it would be good therapy for her hands. His notes say she should return to work the next day without restrictions. *Id.*, PageID 1137.

Raymond Wurapa, M.D. On August 25, 2011, Dr. Wurapa, an orthopedist, began treating plaintiff for injuries sustained in the July 2011 motorcycle. *Id.*, PageID 1091. Plaintiff suffered multiple abrasions to the right hand. She underwent occupational therapy, which she did not tolerate well due to pain. Dr. Wurapa indicated that plaintiff still had significant functional limitations with her right hand. On physical examination, plaintiff had severe extension contracture involving the right middle, ring and small digits. She was diffusely tender to palpation across all 3 digits. Passive flexion in these digits were no more than her active motion and limited mainly by pain. She had mild diffuse edema through the ulnar hand with palpable induration through the 3 digits. Dr. Wurapa diagnosed post-traumatic contracture of the right middle, ring and small digits. He recommended that plaintiff undergo occupational therapy under his supervision. She would have limited use of her right hand in the interim. *Id.*

On November 10, 2011, Dr. Wurapa recommended that plaintiff undergo PIP joint release with extensor tenolysis. *Id.*, PageID 1102. The surgery was scheduled for

4

November 28, 2011. *Id.*, PageID 1112. On January 12, 2012, Dr. Wurapa saw her for a follow up after the contracture release surgery. She was "making slow but steady progress with her rehabilitation and therapy." Doc. 16-2, PageID 1156. She still had "significant pain requiring intermittent narcotic use." *Id*. She was to continue with therapy and home exercises, increasing activity as tolerated. Her restrictions prevented her from performing work using her right hand. Dr. Wurapa planned to see her again in six weeks. *Id*.

On February 23, 2012, Dr. Wurapa released McGill to work up to six hours a day without restriction. He would evaluate whether she was able to tolerate work over the following six weeks. *Id.*, PageID 1173. On March 22, 2012, Unum sent McGill a letter stating that it had approved her request for long term disability benefits. *Id.*, PageID 1213. McGill worked six hours on March 31 and again on April 4, 2012, then went back out on leave. Doc. 16-4, PageID 1384. McGill returned to Dr. Wurapa on April 5. He said she was making "slow but steady progress with rehabilitation but appears to be plateauing at this time." Doc. 16-3, PageID 1331. She reported "difficulties with prolonged or heavy use of her right hand." *Id*. On examination there was minimal edema over the right hand. Motion of her digits appeared to be limited more by discomfort than by primary contracture. She had recently completed therapy and was continuing home exercises. He talked with her about the possibility she could not continue her current employment if her restrictions could not be accommodated. *Id*. Dr. Wurapa scheduled her for a functional capacity evaluation. Doc. 16-3, PageID 1319.

On May 8, 2012, Robert Crossman, OTR/L, CEAS, performed an occupational evaluation at Mt. Carmel East Occupational Rehabilitation. Doc. 16-4, PageID 1392-1407. Overall, he concluded that McGill made "high levels of physical effort" during testing and made "reliable reports of pain and disability." *Id.*, PageID 1393. Her occupation was reported as customer service representative, Dictionary of Occupational Titles Code 239.362.014. McGill said that "she sat with a headset on and worked at a computer during the entire 10 hour shift." *Id.* She reported "that she took 25 to 30 calls an hour." *Id.* She changed screens approximately 10 times during each customer call. *Id.*

In a section of the report labeled "Physical Abilities and Job Match", Crossman said that the that a customer service representative is required to type on a keyboard and use a mouse constantly (greater than ⅔ day). *Id.*, PageID 1394. During physical capacities testing, McGill demonstrated "[g]ood ability but limited tolerance" to write continuously while seated. She exhibited "[l]imited (R) hand function, speed and efficiency" keyboarding.[1] *Id.*, PageID 1404. She primarily used the thumb, index and middle fingers of the right hand while keyboarding. She avoided the use of her ring and little finger. During 5 minutes and 25 seconds, she typed 130 words with 8 errors. *Id.* Based on findings from the testing, it was recommended that plaintiff

> Limit time in repetitive and sustained tasks (keyboarding, use of computer mouse, writing with (R) hand to 10 minutes, take a break and perform a different task. When return to work, perform a variety of tasks throughout the day."

---

[1]The writing and keyboarding work simulation testing both involved "copying down a short story". *Id.*, PageID 1403.

*Id.*, PageID 1395.

On May 21, 2012, a Unum employee contacted McGill to obtain an update about her right hand. *Id.*, PageID 1409-11. McGill said that she could not bend the pinky, ring and middle fingers of her right hand at all. She could use her index finger and thumb. She had trouble with dressing and buttons. *Id.*, PageID 1409. McGill said she could not perform her job at Time Warner because she was unable to type or grasp a computer mouse. She had no other source of income. Her spouse was on disability. She had two children, 13 and 15 years old. *Id.*, PageID 1410.

On June 5, 2012, a medical consultant for Unum wrote Dr. Wurapa a letter asking him whether McGill could perform work consistent with the following vocational assessment:

> Exerting up to 10 pounds of force occasionally and/or a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects, sitting most of the time, may involve walking or standing for brief periods of time. Occasionally standing and walking, and frequently reaching, handling, fingering, and keyboard use. Frequent is defined as: Activity of condition exists from 1/3 to 2/3 of the time (2.5 -5.5 hours a day in an 8-hour workday).
>
> Our vocational specialist has provided assessment of Ms. McGill's occupation with exertional and physical demands as follows: requires exerting up to 10 pounds. of force occasionally and/or a negligible force frequently to lift, carry, push, pull, or otherwise move objects, sitting most of the time, may involve walking or standing for brief periods of time. Occasionally standing and walking and frequently reaching, handling, fingering, and keyboard use. Occasionally = up to one-third of a workday (zero to 2.5 hours per day in an 8 hour work day) and frequently= up to two-thirds of a workday (2.5 to 5.5 hours per day in an 8 hour day).

*Id.*, PageID 1447. Dr. Wurapa responded that plaintiff could perform work consistent with those job requirements, but would "require frequent breaks to accommodate conditioning." *Id.*, PageID 1455. He recommended "HEP as instructed in therapy" and "pain control" to manage her condition. *Id.*

Beth S. Darman, M.Ed., NCC, CRC, LPC. On May 30, 2012, Ms. Darman, a senior vocational rehabilitation consultant at Unum, was asked to review the file and determine the physical demands of the job McGill performed for Time Warner, as that job is performed in the national economy. McGill's job title was "Rep 2, Customer Care Rep". Doc. 16-4, PageID 1421. Although there was no job description from the employer in the file, Darman believed, based on her previous experience with Time Warner and McGill's description of the job, that plaintiff's occupation was most consistent with that of a call center representative, eDOT# 299.357-201. Doc. 16-4, PageID 1421-23. Darman concluded that call center representative was more consistent with the job description than customer service representative because "the amount of time spent on the telephone and sitting is greater in a call center than in a typical office environment where a Customer Service Representative would be working." *Id.*, PageID 1423. But she did advise that if a job description that appeared to contradict that occupation later became available, she should be contacted again for an additional assessment. *Id*. The duties of a call center representative were described as follows:

> Answers general inbound and places outbound calls in a call center with the goal of increasing business, customer satisfaction and customer retention. Follows basic procedures and scripts, using fundamental knowledge to navigate

8

company's customer information systems and/or order system along with a basic knowledge of company, services and products. Responds to customer questions, explains available services, corrects errors, provides information on pricing, takes orders, develops leads and/or sells products and services.

*Id.*, PageID 1422. The position of call center representative required frequent keyboard use. Frequent was defined as activity existing from one-third to two-thirds of the time. *Id*. Ms. Darman opined that plaintiff could use her left hand for manipulating the mouse. *Id.*, PageID 1423.

<u>Richard Oestreich, Ph.D.: November 14, 2012 Vocational Report</u>. In a November 14, 2012 report, Dr. Oestreich stated that based on a phone interview with plaintiff and examining a variety of sources, her job can best be described as that of a customer service representative, skilled and sedentary, Dictionary of Occupational Titles Code 239.362.014. McGill told him that all of the fingers of her dominant right hand were virtually useless for keyboarding. Since her late November 2011 tendon release surgery, the fingers do not bend and become painful with repetitive use. Doc. 16-6, PageID 1590. Plaintiff told Dr. Oestreich that she took 6-12 calls an hour, one after the other, each call lasting 5-10 minutes. From the job descriptions he researched and McGill's knowledge and experience with her customer service representative job, Dr. Oestreich concluded that the "her job required her to use her fingers and hands constantly and continuously at the job she was doing before [her] motorcycle accident . . . ." *Id.*, PageID 1591. The job required that there be no limits on the use of the hands. Using a keyboard was so integral to the job that she used a telephone headset to allow her to use her hands at all

9

times. All of her work involved inbound calls. Dr. Oestreich opined that McGill was "unable to do her prior job as a customer service representative due to her limited ability to finger, feel, or use a keyboard with her dominant right hand." *Id*.

Richard Oestreich, Ph.D.: November 21, 2012 Supplemental Vocational Report. Dr. Oestreich compared the job that Ms. Darman identified as McGill's job with the position of a customer service representative. Dr. Oestreich was unable to locate the position of call center representative in the Dictionary of Occupational Titles. In reviewing the job description provided by Ms. Darman, Dr. Oestreich noted that half of the stated duties refer to outbound calling in addition to sales scripts and a goal of increasing business by developing leads and initiating the sale of products. McGill's position only entailed inbound calling, which requires a great deal of documentation and differs appreciably from the documentation connected with outbound calling where the vast majority of calls either do not reach anyone or result in a hang-up or an expression of lack of interest. Inbound calls, on the other hand, are initiated by a customer who wants to talk to an actual representative to solve a problem. Doc. 16-6, PageID 1587. Ms. Darman defined "frequent" as between one-third and two-thirds of the day, but Dr. Oestreich noted that McGill indicated that she used her keyboard nearly 100 percent of the time. He argued:

> One who uses the keyboard for what Ms. McGill described as nearly 100% of the time simply cannot do the job with three basically useless finges for any vocationally competitive amount of time and certainly not for two thirds of the time.

10

*Id.*, PageID 1588. Ms. Darman also suggested that plaintiff could use her left hand for manipulating the mouse, but Dr. Oestreich disagreed with this contention on the basis that McGill would then have to use her less effective hand for keyboarding. Dr. Oestreich maintained that the job which he assigned to plaintiff appeared to most accurately reflect McGill's job with Time Warner and had an actual DOT code defining its duties. *Id.*

Shannon O'Kelley, M.Ed., CRC. On January 17, 2013, O'Kelley, a senior vocational rehabilitation consultant for Unum, responded to a request to evaluate whether plaintiff's job was most consistent with the occupation of customer service representative and, if so, to determine whether the occupation as performed in the national economy requires constant and/or repetitive use of the hands. Doc. 16-6, PageID 1622-26. O'Kelley reviewed the reports authored by Oestreich and Darman, her current medical restrictions, the DOT, eDOT, and O*NET. *Id.*, PageID 1625-26. She concluded that McGill's occupation was customer services representative, eDot 239.362-014. Further, she stated the opinion that the occupation "would require frequent use of hands which would not be characterized as repetitive (without the ability to alter or change the method of an activity and at a specific rate of speed)." *Id.*, PageID 1626.

**IV. Decision**

Section 502(a)(1)(B) of ERISA authorizes an individual to bring an action to recover benefits due to her under the terms of her plan. 29 U.S.C. § 1132(a)(1)(B). A plan

11

administrator's decision to deny benefits is typically reviewed de novo. However, when the plan administrator has discretionary authority to determine eligibility and construe policy terms, the more deferential arbitrary and capricious standard of review is applied. *Sanford v. Harvard Indus., Inc.*, 262 F.3d 590, 595 (6th Cir.2001). Here, the Court must apply the arbitrary and capricious standard because the policy grants Unum discretionary authority to interpret eligibility for benefits and to construe the policy's terms. *See* doc. 16-3, PageID 1260 ("Benefit determinations include determining eligibility for benefits and the amount of any benefits, resolving factual disputes, and interpreting and enforcing the provisions of the Plan.").

When applying the arbitrary and capricious standard, a court must review the plan provisions and the record evidence to determine if the administrator's decision was "rational." *Shields v. Reader's Digest Ass'n, Inc.*, 331 F.3d 536, 541 (6th Cir. 2003). Even if there is evidence sufficient to support a finding of disability, the decision is not arbitrary or capricious if there is a reasonable explanation for the administrator's decision denying benefits. *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000). Despite the deferential standard of review, courts do not rubber stamp a plan administrator's decision; rather, a court must review the quantity and quality of the medical evidence on each side. *Evans v. UnumProvident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006). "A decision reviewed according to the arbitrary and capricious standard must be upheld if it results from 'a deliberate principled reasoning process' and is supported by 'substantial evidence.'" *Schwalm v. Guardian Life Insurance. Co. of America*, 626 F.3d 299,

308 (C.A.6 (Ohio),2010)(quoting *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir.1991)). The court's review is limited to the administrative record, and only evidence presented to the plan administrator at the time he determined the employee's eligibility may be considered. *Wilkins v. Baptist Healthcare System., Inc.*, 150 F.3d 609, 618 (6th Cir.1998).

Plaintiff argues that because Unum is both the claims administrator and payor there is a conflict of interest that requires a heightened standard of review:

> We have recognized that a conflict of interest exists when the insurer both decides whether the employee is eligible for benefits and pays those benefits. *Gismondi v. United Techs. Corp.*, 408 F.3d .295, 299 (6th .Circuit 2005); *see Killian v. Healthsource Provident Adm'rs*, 1'52 F.3d 514 at 521 (6th Circuit 1998)(observing "there is an actual, readily apparent conflict . . . not a mere potential for one" where a company both funds and administers an LTD policy because "it incurs a direct expense as a result of the allowance of benefits, and it benefits directly from the denial or discontinuation of benefits"). In this case, because defendant maintains such a dual role, "the potential for self-interested decisionmaking is evident". *Univ. Hospitals. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846 n.4 (6th Cir. 2000). However, this conflict of interest does not displace the arbitrary and capricious standard of review; rather, it is a factor that we consider when determining whether the administrator's decision to deny benefits was arbitrary and capricious. *Kalish v. Liberty Mut/Liberty Life Assurance Co. of Boston*, 419 F.3d 501, 506 (6th Circuit 2005). The reviewing court looks to see if there is evidence that the conflict in any way influenced the plan administrator's decision. *Carr v. Reliance Standard Life Insurance. Co.*, 363 F.3d 604, 606 n.2 (6th Circuit 2004).

*Evans v. Unum Provident Corp.*, 434 F.3d 866, 876 (6th Circuit 2006). *See also Peruzzi v. Summa Med. Plan*, 137 F.3d 431 , 433 (6th Circuit 1998).

Defendant counters that case law establishes that "if the conflict of interest did not actually motivate [the] decision, then it is given no weight as a factor in determining

whether the decision was arbitrary and capricious." *Pflaum v. Unum Provident Corp.*, 175 F. App'x 7, 10 (6th Cir. 2006). Since plaintiff offers no example of any bias that resulted from a conflict of interest, there is no evidence that the structural conflict of interest adversely impacted her. Consequently, defendant argues that the conflict should not factor in the court's review under the arbitrary and capricious standard.

*Peruzzi*, above, involved the denial of coverage for a high dosage chemotherapy and bone marrow transplantation procedure because the treatment was experimental. The plaintiff in *Peruzzi* argued that there was a conflict of interest because the defendant both determined and paid the claim. The Sixth Circuit held that the factor did not warrant overturning the lower court's grant of summary judgment since the panel making the determination had no financial interest in the outcome of their decision and plaintiff had offered no evidence the decision was motivated by cost. 137 F.3d at 433. In *Pflaum,* the Circuit held that "[b]ecause Pflaum points to nothing beyond the mere existence of a conflict of interest to show that UNUM's decision was motivated by self-interest, we give no further consideration in the arbitrary and capricious analysis to the possibility that the conflict affected UNUM's decision-making." *Accord, Hockin v. Kmart Corp. Long Term Disability Income Plan*, 105 Fed.Appx. 755 (6th Cir. July 27, 2004).

Here plaintiff has offered no evidence supporting a finding that Unum's decision was influenced by the cost of continuing long term disability payments. I will consider the conflict of interest as a factor in the arbitrary and capricious standard of review.

In a January 18, 2013 letter to plaintiff's attorney, Unum outlined its reasons for concluding that the job of Customer Service Representative, as performed in the national economy, did not require constant keyboarding:

> You also indicated Ms. McGill's work involved exclusively inbound calling as opposed to outbound calls. During the course of the calls she had to use both hands to move from screen to screen. The calls come in non-stop. She has to go from one call to another with no break in between. You indicate she would spend most of the time writing with one hand and entering data on the computer with the other.
>
> Many of the tasks you describe appear to be specific to Ms. McGill's job at Time Warner Cable. This includes the types of calls (inbound vs. outbound) and the number of computer screens she had to navigate. The Long Term Disability policy covers Ms. McGill for an inability to perform her occupation, not the inability to perform certain job-specific requirements of the position she held or the inability to function within a specific employer's environment.
>
> As part of the appeal review, we had another vocational specialist review Ms. McGill's occupation in consideration of Dr. Oestreich's conclusions. Our vocational specialist agrees that Ms. McGill's occupation is most consistent with that of a "Customer Service Representative" in the national economy. Although the title of the occupation is different from what was used in the prior vocational reviews, the physical demands relating to hand use and keyboarding are unchanged. The prior comments about the ability for intermittent breaks in keyboarding activities and the use of the mouse with the left hand also remain appropriate to this occupation. This would not alter the description of the physical demands previously provided to Dr. Wurapa.
>
> Our vocational specialist indicate the occupation of Customer Service Representative (eDOT 239.362-014) as performed in the national economy requires frequent keyboarding and occasional to frequent handling. There is no indication of a requirement for "constant" or "repetitive" tasks involving hand use or keyboarding as the occupation exists nationally. If Ms. McGill was required to perform such constant or repetitive activities, this would be specific to her job at Time Warner Cable. It is not representative of the occupation as a whole.

Doc. 16-6, PageID 1631.

There is substantial evidence supporting Unum's determination that McGill can perform her occupation of customer service representative as it is performed in the national economy. Two vocational experts, Darman and O'Kelley gave the opinion that the occupation of customer service representative as it is performed in the national economy requires frequent, not continuous, use of the hands to keyboard and operate a mouse. Dr. Wurapa said that, given that job requirement, McGill could perform the job.

As an alternative argument, plaintiff contends that even accepting Unum's finding that the job of customer service representative requires the use of her right hand for typing and keyboarding frequently rather than constantly, the Functional Capacity Evaluation demonstrates McGill can only tolerate the use of her hand for typing and keyboarding occasionally. The term "occasionally" is defined as up to one-third of the day. While that was Crossman's conclusion, Unum was entitled to evaluate all the evidence and come to its own, independent conclusion. In August 2011, Dr. Westerheide, an orthopedist, believed McGill had the ability to return to work. She went to Dr. Wurapa, who recommended contracture release surgery. Following that surgery, Dr. Wurapa concluded that McGill could return to work. The opinions of two orthopedist is substantial evidence supporting the finding that plaintiff could perform the frequent use of hands required by her occupation, even though other, contrary, evidence was in the record.

16

Plaintiff's also argues that the record does not contain a complete copy of Darman's report or statement of her credentials is not born out by a review of the record. Her degrees and credentials are included. Moreover, her analysis is set out and reported. Doc. 16-4, PageID 1421-23. Further, Unum did not base its decision on the characterization of plaintiff's job as call center representative rather than a customer service representative. Instead, Unum maintains that either position, as it is typically performed, requires only frequent keyboarding rather than continuous keyboarding as plaintiff maintains.

To support his conclusion that the position of customer service representative required constant keyboard, Dr. Oestreich relied on job descriptions from O*NET Online, callcenterkit.com, bestjobinterview.com, and hrvillage.com. Based on these job descriptions, Dr. Oestreich concluded that plaintiff would have to use her fingers and hands constantly and continuously.

The record offers a reasonable explanation for Unum's decision that plaintiff was not eligible for long-term disability benefits. Unum concluded that the job of customer service representative, as it typically performed in the national economy, only requires frequent, rather than continuous, keyboarding. When presented with a description of tasks, including frequent keyboarding, Dr. Wurapa opined that plaintiff could perform the job as described. While it is true Mr. Crossman concluded in the Functional Capacity Evaluation that plaintiff did not match the requirements of a customer service representative, Mr. Crossman based his job description on the job as described by

17

plaintiff at Time Warner Cable. The job descriptions relied upon by Dr. Oestreich do not provide an approximate percentage of the day that an individual in these positions would be using the keyboard. Unum specifically found that the job as performed by plaintiff at Time Warner Cable did not reflect the occupation as it exists nationally. Although Unum does not provide the basis for Ms. Darman's assertion that the position required only frequent keyboarding, plaintiff has not shown that keyboarding in such positions is continuous. Given the deferential review granted Unum, I cannot say that Unum's decision was unreasonable or unsupported by substantial evidence give that plaintiff's treating doctor concluded that plaintiff could perform the position which required frequent keyboarding.

**V. Conclusion**

For the reasons stated above, plaintiff Bridgett McGill's February 18, 2014 motion for judgment on the administrative record (doc. 22) is DENIED and defendant Unum's motion to uphold the administrative decision (doc. 23) is GRANTED.

s/Mark R. Abel<br>
United States Magistrate Judge